Thank you, Judge Fletcher. Good morning. My name is Todd Sawicki. I'm with Alston & Bird out of Atlanta, Georgia, representing the appellant, Royal Alliance Associates, a broker-dealer. I appreciate the opportunity to appear before you. My hope and dream is to reserve five minutes, but we'll see what happens. Judge Anderson's orders denying Royals preliminary injunction motion and then granting the claimants, the appellees, I'll call them claimants if you don't mind, the claimants motion to compel arbitration were wrong. Both of those issues on appeal are subject to de novo review by this Court. The motion to compel arbitration issue is a question of law. The interpretation of the asset purchase agreement between Royal and United Securities, not these claimants, by the way, that interpretation, whether it's ambiguous, is a question of law as well. So both issues are subject to de novo review. On this action concerning whether arbitration should be compelled, claimants bear the burden of proving the existence of an arbitration agreement with Royal Alliance by the preponderance of the evidence. The problem with Judge Anderson's orders are there's no evidence in the record that supports their position. The only evidence, the record is undisputed in our favor. So the agreement, I guess what the Court looked at is the agreement says that at closing the buyer will have all customer accounts and the argument is, or the claim is, that all customer accounts include the Mooney and the other account, your client's accounts. And so at closing, as a matter of contract law, the buyer becomes the legal owner of those customer accounts. So the Court decided just as a matter of contract law. Judge Anderson's conclusion that that contract provision, the contract itself, was unambiguous is the problem. In order to reach that conclusion, he had to exclude consideration of the rest of the contract, take that little provision out of context. He failed to consider how the contract, the whole transaction was set up and closed, and the mechanism, and how the mechanisms for addressing the transfer of accounts from one firm to the other were handled. So I understand that there's other language in the contract that you point to that would make, in your view, make the contract ambiguous. That suggests that only the customer accounts of specific representatives. Transferred representatives. Transferred representatives, specific representatives that they chose, only those would be purchased. Let's say for a moment that those are not part of the contract, that all we have is this language about all customer accounts. If that was all that was in the contract, wouldn't the Court be correct that at the point when the transaction closed, the buyer would be the owner of all customer accounts, including your clients? That's an entirely different contract. Remember what happened here, Judge. But is that correct? So, I mean, this says buyer agrees to buy and seller agrees to sell, and at closing, this is what will happen. Buyer will own these contracts or these accounts. So if that was the only sentence in the contract, would buyer own those accounts at closing? I take it there's no dispute that there was a closing. There was a closing. If the contract said only that, then you are right. However. Okay, but there's a lot of other language in the contract that you say make it ambiguous. And let me say for a moment, if I agreed with you that the contract was ambiguous, then what happens under New York law? Under New York law, the Court is entitled to consider parole evidence, and that is the evidence outside of the contract that informs what the party's intent were. That parole evidence includes the pre-contract letter of intent, which was a little more clear, or much more clear, actually, about the limited number of accounts or the limited category of accounts that were going to be transferred. Number two, we have the evidence through declaration of our officers who went through the process of evaluating which representatives they would select to come over. And then following that, we have the party's course of performance. Is there any evidence from the seller as to what the seller intended? I mean, anything from the buyer as to which? We are the buyer. So was there evidence from the seller as to what was intended? There is no direct testimonial or positive evidence from the seller about what was meant. But I note that the seller and certain of the seller's officers are respondents in the claimant's FINRA arbitration that is currently pending and that we're trying to get out of. And they have never raised any cross-claim or argument that we are responsible for their claims by virtue of this language. So that's a mission in and of itself, that they agree with us as to the meaning of the contract. Let me ask you, this is just a very basic lack of understanding on my part. It would seem to me that an account of this nature would have some value. And so somebody would have that account. I mean, is there any evidence in the record as to where that account is? And am I wrong that an account would be evidence of some value or have some value as property? Yes. And the way these independent contractor broker-dealers work is a little bit different than what you may be familiar with, what we call the wire houses, like the Merrill Lynch's and Morgan Stanley's. Unlike wire houses, independent contractor firms have their registered representatives in a independent contractor relationship. It's the rep's business. We don't do anything to service the accounts. We allow the reps to control those accounts. So when a rep goes from one firm to another, he is permitted and expected to take those accounts with them. That is why we went through that process of selecting which representatives we wanted to join our firm and told USA in the contract, as you saw, that you must terminate your registration with those folks prior to closing to give those folks the opportunity to take their accounts to another firm, which is what Mr. Tweed did. He went to CapWest and he registered with that firm in February of 2007 before our closing. And so was there evidence that those accounts went with Mr. Tweed wherever he ended up? No, we did not seek discovery on that issue because we didn't think we needed to given our record. But I will tell you, though, there is no evidence that it didn't. And remember, claimants bear the burden of proof. So he goes to CapWest, and according to the evidence I've got here in front of me, he's now with Cabot Lodge, correct? Mr. Tweed. That's correct. And remember, Judge, you mentioned that these accounts have value. Mr. Tweed has the primary interest in keeping control of the accounts that he generated and the client relationships that he has. I think you would be surprised if we had him in here for us to all have concluded that the accounts that he was responsible for a customer relationship he generated were no longer his because of something his former broker dealer agreed to with us. That's just not the way it works. They're his accounts. He took them with him, presumably. They haven't proven otherwise. And otherwise, claimants have absolutely no evidence of any customer relationship with us. They have no account with us. They never heard from us. Their declarations say so. They didn't even know we existed until the claimant's attorney came up with this, how we say, novel theory. So they have not shown any, and there was no services provided by us, no goods offered, no advice provided. Those are the indicia of a customer relationship aside from an actual agreement, as we understand arbitration clauses are to be established. There's none of that in this record. And as to the ambiguity issue, I guess I should highlight not only do we have the respondents in the arbitration never coming up with this novel theory of what the contract means, but the only people who agree with that proposition are Mr. Katan's right claimant's counsel and Judge Anderson. The parties to the agreement, USA and Royal Alliance, they never contemplated that we would be responsible for all accounts. The two judges in Virginia and Colorado who considered the very same issue, the very same contract, we put it in front of them because there were non-customers seeking to compel arbitration against us. They did not consider this novel theory either. I've never been in a case where the parties agree as to the meaning of the contract. They carry it out through their course of performance, and then some stranger and a judge reaches a different interpretation. If that's not the basis for a conclusion of ambiguity, I don't know what is. And in a sense, of course, this isn't even a suit to enforce the contract. But they were trying to get the benefit of it. Of course they are, right. Which brings up the whole standing issue. But it's not entirely clear to me whether all of the rules for construction of contracts, parole evidence rule, performance and so on, apply when it's an outsider to the contract seeking to get the benefit of it rather than some part of the contract seeking to enforce. Well, I'm sure, Judge Fletcher, that the GECC MC case is forefront in your mind. Absolutely. I think of nothing else. But that's a great example of a case where they analyze a third-party beneficiary standing. And Judge Goodwin, in which you agreed, found that the hurdle is very high. The intent has to be clear. We have Section 11.1 of our agreement that disclaims any right of any non-party to take advantage of the contract. So we don't even have to get there because claimants don't have standing to enforce or try to get the benefit of this agreement. You had mentioned that all the parties agree to what this contract means. But I thought you said that the party to the agreement with you, that you submitted no evidence concerning their intent or their statement about the meaning of the contract. No, I mean, currently that's a defunct entity. USA, United Securities Alliance. But there are individuals who are affiliated with United Securities Alliance that claimant sued in the arbitration. My point was that nobody has ever said in that proceeding or otherwise that somehow Royal Alliance became responsible for all accounts, even for those with non-transferred representatives in connection with this transaction. I'll stop and save a few minutes. Thank you. May it please the Court. I'll begin with the GECC case. In the GECC case, it was recognized that there could be situations where the intent of the contract would give rights to enforcement of the purchase agreement with Chase, such as was cited by the Ninth Circuit here, the situation of depositor accounts. I suggest to you that we can apply the same rationale here because the purchase agreement and it's called purchase agreement deliberately in the opening brief and the reply brief because they want to dodge the critical distinction that is present in this agreement. It's called a transfer of rights agreement. And the transfer of rights agreement makes clear that it is transferring all of a certain category of assets. And in the recitals, it describes that category of assets includes DPP accounts, which are accounts held at sponsoring entities and they're not traded accounts, such as... What do you do with all the evidence that shows that Mr. Tweed's accounts never were transferred to Royal Alliance? Maybe, I'll assume for the purpose of the question, that maybe the contract required that they be transferred, but it's pretty obvious they never were. Well, I wouldn't adopt that view for two reasons. First of all, Mr. Tweed is not a broker-dealer. Mr. Tweed could only operate on behalf of a broker-dealer. There's the evidence, the record evidence is that... There's no evidence at all that he ever operated as a broker-dealer for Royal Alliance. No, no. He operated as a registered representative for United. He left United in February, one month before the closing of the Royal purchase of United. Therefore, the accounts of the claimants were... The defendants below, claimants in the arbitration, the accounts of the claimants remained assets of United as direct... What they call DPP accounts, accounts with sponsors. Tweed left, yes. He left before the transfer closed. There's no record evidence of Tweed taking accounts anywhere to a new broker-dealer. Accounts must be held by, sponsored by, a broker-dealer. That much is clear from the transfer agreement here. The transfer agreement expressly recognizes that the sole owner of the accounts at issue is United, not Tweed, not any of the other representatives who left United because they were not wanted or for whatever reason they did not transfer to Royal. It is a straw man for my colleague to come up here and argue that there's no evidence that Tweed didn't take the accounts. That was their burden. They can't prove Tweed took any accounts. The accounts were not taken. They remained at United. The fact... And United and the suggestion that United had no responsibility for the accounts is wrong. We cited to Judge Anderson, and it was unrefuted, that the NASD rules require that when you, you as broker-dealer, take over an account, you have responsibility to review the account. That is the hook that makes Royal responsible. Royal admitted it acquired the accounts, including the DPP accounts. It acquired all of the accounts of United, and when it acquired them under the rules of the NASD, which it agreed to abide by as an interpretive rule, given the same force and effect, that when it agreed to abide by that rule, it had a responsibility over the accounts assumed. Let's say for a moment that we think this contract is ambiguous as to what was transferred to Royal, and that it's not clear that Royal took it closing all of the accounts, all of the customer accounts that were owned by United. Where does that leave us if we decided that? Was there evidence? Is this something we can decide, or would it have to be remanded to the district court? Well, I would say at best it would have to be remanded for that determination. And why is that? Because there was evidence that was submitted before the district court regarding whether your clients were customers or not of Royal. Why can't we look at that evidence? Well, to begin, the evidence that was submitted is limited by the nature and extent of those persons' activity with respect to the transfer agreement. Is there any evidence that Royal has those accounts other than the contract? What other evidence was submitted that those accounts were transferred? I think it's clear Judge Anderson recognized that when Royal elicited as part of the transfer agreement that United could no longer be in business as a broker-dealer. But what other evidence other than the contract itself indicated that your clients, Mooney and Schmedegee, that their accounts were transferred to Royal other than the contract itself? I guess it's the absence of any evidence that it went anywhere else. So there was no affirmative evidence other than the contract itself. Is that correct? That would be correct. And I would point out as well, however, that there was an absence of evidence on the other side as to whether or not the accounts were not being taken over by Royal. Because as Mr. Curley's declaration... I thought Royal said that they had looked through their accounts and their transactions and their records and they didn't find any evidence that either of those two individuals had accounts with them. Their evidence was effective. Well, there were two parts to the evidence. First, Mr. Curley says that we closed the agreement and we received a transfer of the accounts. That's what he says in his declaration. With respect to the question then of who investigates whether or not the Schmedegee and Mooney accounts were transferred, there is scant evidence on that and it's incomplete because all they say is we've searched our electronic records and we don't find them. But part of the... So there is some evidence that they didn't get the accounts, which is that they don't see them. As I had questioned, I guess perhaps my misunderstanding, I would think the accounts would have some value and so somebody has those investments somewhere, I would assume. Am I wrong with that? You're not wrong. The accounts do have value. That's correct. And that is the value that Royal sought to acquire when it acquired the United accounts was that it recognized the accounts as owned by United, not Tweed. Your clients don't... I mean, this was a little puzzling to me. So your clients say that Royal has the accounts. And so your clients have no idea where their accounts is. Do I understand that correctly? Well, they're direct private placement accounts, DPP accounts. So they're held with the sponsor, but the broker-dealer is responsible for the supervision of that account and review of that account, including reviews not less than every three years under the NASD rules. They know where their money is. They just don't know somebody else is overseeing it. And there's a question about who's overseeing it. That's correct. It is the question about oversight of the DPP account, correct. I'm having a hard time understanding why we care about the 2007 purchase agreement. If you and I have an agreement and you agree to transfer five cows to me, you transfer four, you negligently let one cow get out of a gate and gets on a highway and somebody hits it and is injured, why should I care or need to worry about being responsible for that cow that you never gave me? Because the NASD requires the purchaser and transferee of accounts, such as customer accounts, to be responsible to the customers for those accounts. It's different than the analogy that you're drawing. In the case of a broker-dealer, it agrees to be bound by the rules of the NASD. The NASD rules require them to shepherdy in custody the accounts. The fact that the cow got lost or killed, it remains that United was no longer in the cow business, and that was part of what Royal negotiated, that United would be out of the cow business and Royal would take all of its cows. Now, if Royal then fails to properly supervise the receipt of all cows, in your example, or all accounts in our factual analysis, then Royal is responsible for those cows. It's ambiguous as to whether Royal agreed to buy that cow. Well, I don't think there's any ambiguity about them having... I don't think there's any ambiguity whatsoever about that. You're saying that all cows will be transferred, but then there's other things that say we'll select which cows we take. That's the argument that... I don't think that's true. I think that, as Judge Anderson, I think, aptly observed, discussing how the accounts would be transferred, there's no ambiguity that what was to be transferred, and that's all of the accounts were to be transferred. That's how he cut through the argument about some mechanical aspect of transferred registered representatives versus others. I'm having trouble understanding a fair amount of this as you talk. You say that Mr. Tweed leaves United before any transfer to Royal, correct? Correct. What does Mr. Tweed take with him when he leaves? Anything? He takes... well, he takes nothing with him when he leaves. He might take some customer information, but he does not take customer accounts, because the customer accounts, was my point, are owned and remained owned as the agreement recites. When Mr. Tweed goes over to Cap West, he starts all over again with no customers? Well, he may be able to get Cap West to accept the transfer of the cows that were at United or the accounts at United, but he did not do so. How do we know that? Well, we know that because of the absence of evidence, because Royal doesn't produce a transfer form of the United DPP account that it took over when it accepted the closing in March of 07. But United would have done that, not Royal, because if those accounts were transferred when Tweed left, they would have been transferred by United, and Royal never would have seen them. But you see, it would have... but Royal would have had... there's no evidence of a transfer of Tweed's accounts before... of the United accounts over which Tweed was the rep prior to March of 07. There's no evidence of that. The evidence is that all of the accounts transferred to Royal. It would be unreasonable, just as I understand how this industry works, for Mr. Tweed to say, I'm leaving, I'm leaving all my accounts with you, I'm going over to Cap West and starting over as a complete newcomer to the industry. Except that Tweed... that Cap West may not have allowed the transfer of the accounts, and Cap West would have had to initiate the transfer, much the same as if you would transfer a 401k or a pension account broker to broker, you would have to initiate the... But put yourself in the position of Royal, assuming that, and I understand you're not going to concede to this factual matter, but assume that Tweed leaves United before the transfer to Royal occurs. That we do know. Assume further that Tweed takes his accounts with him when he goes to Cap West, and they now become the accounts of Cap West. If that happens, you're asking now Royal to say, well, I have evidence that didn't happen. Well, when Royal gets the information, once it gets transferred from United, it's going to get me to see nothing about that, because that was all finished before the transfer to Royal. The point I make is that Royal took all of the records of United. It would be able to prove that United transferred. Your point is, and I understand your point, is to suggest that there might be record evidence, which was not produced, and we do not concede it exists, that a transfer of the claimants' DPP accounts moved before the Royal closing. That's your point. But you bear the burden of proof, and you've got nothing that shows that they went to Royal. We've got the record of the purchase, and we've got the accounts that were at United. The record of what purchase? The contract that we're talking about? Yes, the contract. The contract seems to me profoundly ambiguous. What other evidence do you have that Mr. Tweed's accounts were transferred to Royal? Well, they're not Mr. Tweed's accounts. You mean United's accounts over which Tweed was the rep? Correct. Well, the only evidence we have is that there is no record evidence that it moved elsewhere other than to Royal. That's our evidence. That's not much. Well, but nothing stopped them from obtaining a declaration or anything from Tweed or evidence from Tweed. There simply is no record. Nothing stopped you either. Except that we don't have United's accounts, and United's account records, there would be an account record, excuse me, there would be an account record at United, even if the account transferred, to suggest as they do that we don't have the account because the entire record of the account moved is simply wrong. There would be a record of the United account which would have moved, the records moved with the account according to that agreement. They moved to Royal. The fact there would then be a transfer form in its records that the account had moved to. But you're asking us to believe without much evidence one way or the other beyond this contract, you're asking us to believe that Mr. Tweed leaves United a month before the transaction and that the accounts that he's responsible for he didn't take with him and United then didn't transfer them to CapWest. You're asking us to believe that. That they didn't transfer to CapWest. You're asking us to believe that United did not transfer to CapWest this account that Mr. Tweed had, so when Mr. Tweed goes over there, the account is not transferred. You're asking us to believe that that's what happened. Because there's no record evidence of that. Based on an absence of evidence. I'm sorry? You're asking us to believe that based on an absence of evidence. Well, because the record would still exist at United and would be part of the records transferred. If absence of evidence, then we should. In other words, Royal would have the transfer form that the account moved from United to some other broker dealer. They haven't produced that record. They're in control of that record, not claimants. Okay. Thank you. Any others? And this is coming to us in summary judgment? No, this is coming to you from they claimants commenced a FINRA arbitration. Yeah, arbitration. What I'm really after is how much discovery was available prior to the ruling here. None. How much discovery? What discovery devices? Neither. Other than the declarations, there was no discovery conducted in the underlying. But you had the ability to take evidence in discovery? Both parties did, yes. And you could have, I guess, sought discovery as to where these records did go, didn't go, and you didn't do discovery on that point? We had a Rule 26 conference where I spoke with my colleague, and he indicated to me that we simply have no records. That was his testimony, or his offer. That's to the lawyers. But you didn't go out, you didn't file interrogatories, you didn't take depositions. I mean, there are people out there in the world who might know things. Like you might have contacted Mr. Tweed. We did not take any discovery, no. Got it. Thank you, Judge. First, this Court is absolutely correct to focus on the notion that each account has value. To confirm the profound ambiguity of this agreement, you cannot take the one phrase, all customer accounts in isolation. When you look at the agreement, you'll see that Royal Alliance paid only for revenue generated by the transferred representative's accounts. If we, in fact, owned and received transfer of all the accounts, you would expect reasonably that United Securities would insist on some payment for that in order to get the value that you all recognize. And likewise, you cannot underestimate Tweed's interest in taking all accounts with him wherever he decided to go so he didn't have to start all over again. Remember, those accounts are not only owned by the broker-dealer, they are owned by the claims themselves. They can direct where they're held, who they're supervised by, and who they're going to pay commissions to. So I think the whole value proposition is very clear. Let me finish by, well, I don't have to finish, but next point about positive evidence as to whether there are any information about accounts at Royal Alliance. This is what Mr. Curley in House Counsel for Royal Alliance declared. On May 5, 2016, I directed and supervised a search of Royal Alliance's customer records to ascertain whether claimants, Mooney and Schmedeke, have ever been customers of Royal Alliance. Royal Alliance personnel have reported to me that there are no records reflecting that claimants were ever customers of Royal. Further, that search did not reveal any evidence of any agreement between defendants and Royal Alliance. Therefore, to the best of my knowledge, information, and belief, defendants have never been customers of Royal Alliance, and there is no arbitration agreement between Royal Alliance and defendants. Claimants bear the burden of proof. This is a summary proceeding in the sense that it started as our preliminary injunction motion, and then we are here by virtue of their motion to compel arbitration. Absolutely, they had the right to take discovery. They chose not to. Mr. Contantra, I cannot stand up here and say we didn't produce evidence of where the customer records are and say that he met his burden of proof. That's not what the preponderance of evidence standard means in this context or any other, as this Court well knows. He bore the burden of showing there was an agreement between us or that they were our customers. He did neither. We, on the other hand, affirmatively provided evidence that there was no agreement between us, that we never got any customer relationship with these folks, we never did anything for them, and there is no record of them, excuse me, of claimants ever coming over to Royal Alliance. The reason is that we didn't know about them is because those accounts went elsewhere. Ladies and gentlemen, you do not have to remand this case because it was a summary proceeding, because we're here on the decision, the legal question of motion to compel arbitration. You can simply reverse and direct that judgment be entered in our favor and ask that the district court enjoin the arbitration so we don't have to deal with it anymore. If they want to sue us in court, they can do this. We'll be happy to defend. Thank you. Thanks for the arguments. Royal Alliance v. Mooney now submitted for decision, and that completes our arguments for this morning. We're now in adjournment. All rise.
judges: W. Fletcher, Ikuta, Freudenthal